UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
**DORIS E. LEWIS**,                                          :
                                                             :
                Plaintiff,                :
                                                             :   **MEMORANDUM DECISION AND**
      – against –                                    :   **ORDER**
                                                             :
                                                             :   21-CV-1493 (AMD)
**ANDREW M. SAUL**, *Commissioner of Social*                 :
*Security*,                                                  :
                                                             :
                Defendant.                :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

      The plaintiff challenges the Social Security Commissioner's decision that she was not disabled for the purpose of receiving disability insurance benefits ("DIB") under Title II of the Social Security Act ("The Act"). (ECF No. 10-1 at 6.) For the reasons explained below, the plaintiff's motion for judgment on the pleadings is granted, the Commissioner's motion is denied, and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### I. Procedural History

      On September 12, 2017, the 59-year-old plaintiff applied for DIB, alleging disability beginning June 9, 2017, caused by arthritis, lupus, high blood pressure and interstitial lung disease.[1] (Tr. 160.) After the Social Security Administration ("SSA") denied the plaintiff's claim on November 10, 2017, the plaintiff requested a hearing before an Administrative Law

---

[1] Interstitial lung disease refers to a group of chronic lung disorders characterized by inflammation and scarring that prevent the lungs from receiving sufficient oxygen. *See* Johns Hopkins Medicine: Interstitial Lung Disease: Pulmonary Fibrosis, https://www.hopkinsmedicine.org/health/conditions-and-diseases/pneumomediastinum (last visited September 28, 2022).

Judge on December 1, 2017. (Tr. 65-76.) ALJ Jason A. Miller (the "ALJ") held a hearing on May 10, 2019, at which a vocational expert and the plaintiff—who was represented by counsel—testified. (Tr. 29-49.)

At the hearing, the plaintiff testified that she had a master's degree in public administration and had previously worked as a case manager for adult protective services. (Tr. 40.) She was forced to stop work in June 2017 because of her health. (*Id.*) At the time of the hearing, the plaintiff lived with her two grandchildren, aged 14 and 12, and helped them get ready for school, prepared meals and did laundry. (Tr. 40, 47.) The plaintiff testified that she could not work consistently because of joint pain and lower energy levels. (Tr. 40.) The vocational expert identified the plaintiff's past relevant work as a casework supervisor and testified that this work was performed at the sedentary level. (Tr. 42.)

In a March 5, 2020 decision, the ALJ denied the plaintiff's claim for benefits. (Tr. 7-25.) After determining that the plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 9, 2017, the ALJ found that while the plaintiff's high blood pressure and lung disease were non-severe, she had the following severe impairments: osteoarthritis of the bilateral knees and a connective tissue disorder (rheumatoid arthritis/lupus overlap syndrome). (Tr. 13.) He then determined that none of these impairments or combination of impairments met or equaled the severity of one of the listed impairments in the applicable Social Security regulations. (Tr. 14.) The ALJ concluded that the plaintiff had the residual functional capacity ("RFC") to "perform the full range of sedentary work." (*Id.*) Finally, the ALJ concluded that the plaintiff could perform her past relevant work as a casework supervisor. (Tr. 20.) The Appeals Council denied the plaintiff's application for review on January 21, 2021. (Tr. 1-6.)

**II.      The Plaintiff's Medical Record**

Between April 27, 2015 and July 6, 2017, the plaintiff saw her primary care physician, Dr. Alana R. Orkin, 16 times. (Tr. 233-49.) Dr. Orkin's hand-written notes are hard to read, but she appears to have treated the plaintiff for both arthritis and a respiratory condition. (*Id.*) Dr. Orkin also documented that the plaintiff's weight dropped from roughly 200 pounds to 159 pounds in 2017.[2] (*Id.*) Dr. Orkin ordered a series of x-rays, which the plaintiff got on April 10, 2017. (Tr. 250-53.) These x-rays revealed "moderate osteoarthritic disease of the patellofemoral joint and early osteoarthritic changes of both knee joints." (Tr. 251.) The plaintiff's hand x-rays were normal. (Tr. 250.)

On May 8, 2017, Dr. Orkin referred the plaintiff to Dr. Nuveed Loqman, a pulmonologist, at Brookdale Hospital Medical Center, because the plaintiff had been experiencing shortness of breath for five months. (Tr. 290.) About a month later, on June 13, 2017, the plaintiff went to Mt. Sinai Hospital in Brooklyn after experiencing generalized body pains, shortness of breath and other symptoms, including vomiting. (Tr. 333.) A CT scan of the plaintiff's chest revealed "extensive patchy regions of groundglass opacities involving all lobes of the lungs." (*Id.*) The plaintiff was diagnosed with pneumomediastinum[3] and interstitial lung disease. (*Id.*)

Dr. Timea Csak, a resident in the Brookdale Hospital rheumatology department, examined the plaintiff on June 21, 2017 for symmetrical wrist, shoulder, and knee pain and joint stiffness.[4] (Tr. 293.) The plaintiff told Dr. Csak that ibuprofen did not help with her symptoms.

---

[2] The plaintiff weighed 141 pounds on August 14, 2017. (Tr. 726.)

[3] Pneumomediastinum is the condition of having air present between the lungs in the chest cavity. *See* Johns Hopkins Medicine: Pneumomediastinum, https://www.hopkinsmedicine.org/health/conditions-and-diseases/pneumomediastinum (last visited September 28, 2022).

[4] Attending physician Lawrence J. Bernstein signed the plaintiff's chart on June 21, 2017. (Tr. 293.)

3

(Tr. 293.)  Dr. Csak noted that the plaintiff had decreased ranges of motion and pain upon movement in her shoulders, knees and wrists.  (Tr. 294.)  The next month, on July 19, 2017, another resident at Brookdale Hospital, Dr. Alemante Kassa, saw the plaintiff for symmetrical wrist, shoulder, and knee pain with all-day joint stiffness.  (Tr. 295.)  Dr. Kassa noted the plaintiff was still receiving pulmonary care for her shortness of breath and that her rheumatoid factor[5] was elevated.  (Tr. 295.)  A July 20, 2017 chest CT scan revealed ongoing interstitial lung disease.  (Tr. 301-02.)

The plaintiff saw Dr. Loqman again on July 31, 2017 because she still had trouble breathing.  (Tr. 296.)  Dr. Loqman noted the prior diagnoses of interstitial lung disease and rheumatoid arthritis, and also reported that the plaintiff's rheumatologist, Dr. Bernstein, had changed the plaintiff's arthritis medication from methotrexate to sulfasalazine because he suspected methotrexate contributed to her lung disease.  (Tr. 296.)

The plaintiff went to SUNY Downstate Medical Center on August 3, 2017 with fever, chills and joint pain.  (Tr. 632.)  A CT scan revealed continued evidence of interstitial lung disease (Tr. 593-94), but the plaintiff's symptoms improved with high-dose steroids, and the hospital discharged her on August 10, 2017.  (Tr. 715.)  The plaintiff followed up with Dr. Naureen Kabani, a resident in the Downstate rheumatology clinic, on August 14, 2017.[6]  (Tr. 727.)  A respiratory examination revealed mild, fine "crackles" in her lungs, but the plaintiff had no joint inflammation or tenderness in her hands, and had a good range of motion in her wrists. (Tr. 730.)  The plaintiff followed up about a month later on September 8, 2017 with Dr. Aaliva

---

[5] Rheumatoid factor is a blood test that measures the presence of antibodies that target healthy joints, glands and other issues and cause arthritis symptoms.  *See* MedlinePlus: Rheumatoid Factor (RF) Test, https://medlineplus.gov/lab-tests/rheumatoid-factor-rf-test/ (last visited Sept. 28, 2022).

[6] Attending physician Dr. Yaman Homsi signed the plaintiff's chart on August 15, 2017.  (Tr. 744.)

Burza, a Downstate pulmonologist, who did not notice any "rales, rhonchi or wheezes," but noted that the plaintiff had an eight millimeter nodule from the CT scan.  (Tr. 724, 725.)  Dr. Milena Alvarez Rodriguez, a resident in the Downstate rheumatology clinic, examined the plaintiff on September 29, 2017.[7]  (Tr. 772.)  The plaintiff did not report any pain, and said that she felt "remarkable better," and had walked eight blocks every morning to take her granddaughter to school.  (*Id.*)  Dr. Rodriguez did not notice any joint inflammation or respiratory conditions, and wrote that the plaintiff had good range of motion in all of her joints.  (*Id.*)

On October 22, 2017, consultative examiner Dr. Ram Ravi, an occupational specialist, examined the plaintiff.  (Tr. 822.)  The plaintiff complained of lupus, interstitial lung disease, hypertension and asthma.  (*Id.*)  Dr. Ravi noted that the plaintiff rated the sharp and constant pain in her joints as an eight out of ten, but he said that her interstitial lung disease was "asymptomatic and stable."  (*Id.*)  Dr. Ravi found that the plaintiff was not in "acute distress," but that she walked with a moderate limp, could not walk on her heels or toes and that she "declined" to squat.  (*Id.*)  Otherwise, her stance was normal, she did not require "assistive devices" to walk or need help getting on the examination table.  (*Id.*)  Dr. Ravi did not find anything wrong with the plaintiff's lungs.  (Tr. 824.)

A physical exam revealed decreased ranges of motion in the plaintiff's neck, low back, shoulders, hips knees and ankles, but normal ranges of motion in her elbows, forearms and wrists.  (*Id.*)  The plaintiff also had full grip strength in both hands and her hand and finger dexterity was "intact."  (*Id.*)  Dr. Ravi wrote in his medical source statement that the plaintiff had no limitations for sitting or standing, but had moderate limitations for walking, pushing, pulling

---

[7] Attending physician Yamen Marhaf Homsi signed the plaintiff's chart on September 29, 2017.  (Tr. 791.)

5

lifting and carrying. (Tr. 825.) Dr. Ravi recommended the plaintiff avoid bending because of her lupus and arthritis, and avoid "activities regarding mild or greater exertion due to her history of interstitial lung disease." (*Id.*) Dr. Ravi also recommended that the plaintiff avoid smoke, dust, and other respiratory irritants because of her asthma. (*Id.*)

The plaintiff had another follow-up appointment at the Downstate rheumatology clinic on October 27, 2017. This time she was seen by resident Dr. Su Yien Zhaz Leon.[8] (Tr. 801.) At the time of her visit, the plaintiff reported pain in her hands and back and rated its severity as an eight out of ten. (Tr. 796-97.)[9] Dr. Leon examined the patient, but did not find any respiratory or musculoskeletal problems, aside from grinding in the plaintiff's knees. (Tr. 803.) Dr. Leon also reviewed the results of an October 18, 2017 pulmonary function test, which revealed a "minimal obstructive lung defect." (Tr. 813, 820.)

On November 17, 2017, Dr. G. Feldman, a non-examining internist, reviewed the plaintiff's file. (Tr. 62.) Dr. Feldman opined that the plaintiff had two severe medically determinable impairments—inflammatory arthritis and chronic respiratory disorders. (Tr. 58.) Dr. Feldman also found that while the plaintiff's medically determinable impairments "could have reasonably been expected to produce the alleged symptoms," her "statements concerning the intensity persistence and limiting effects of these symptoms [were] generally not consistent with the evidence of record." (Tr. 59.) The plaintiff could lift 20 pounds occasionally and 10 pounds frequently, sit for six hours and stand and walk for six hours. (Tr. 60.) Dr. Feldman felt the plaintiff could only occasionally climb, kneel, crouch, crawl and reach overhead. (Tr. 60-

---

[8] Attending physician Ellen Ginzler signed the patient's chart on October 27, 2017. (Tr. 814.)

[9] Dr. Leon's chart entry on October 27, 2017 uses identical language to Dr. Rodriguez's chart entry on September 29, 2017. (Tr. 772, 801 ("Today she feels remarkable better – she is able to walk at a "comfortable pace" 8 blocks without SOB.").) The presence of identical typos, and the incongruity of the note with the plaintiff's report that she was experiencing severe pain on October 27, 2018 suggests it may have been copied accidentally from the plaintiff's September 29, 2018 visit.

61.) Dr. Feldman recommended that the plaintiff avoid all exposure to cold and lung irritants. (Tr. 61.)

Starting in September 2017, the plaintiff saw a new primary care physician, Dr. Charles Francis. (Tr. 1073.) The plaintiff saw him six times between September 27, 2017 and April 30, 2018. (Tr. 1070-1126.) The plaintiff's respiratory examination was normal, but she complained of pain in her hands on March 8, 2018 and April 9, 2018. (*Id.*) Dr. Francis also referred her to her pulmonologist, Dr. Burza, but did not explain why. (Tr. 1084.)

On July 1, 2019, Dr. Alnardo Lora, a resident in the Downstate rheumatology clinic, examined the plaintiff.[10] (Tr. 1168.) Dr. Lora did not notice joint inflammation in the plaintiff's hands, but did find grinding in her knees. The plaintiff's respiratory examination was normal. (*Id.*) The plaintiff did not report any shortness of breath or joint pain, said she could walk more than eight blocks, but claimed she had "ongoing fatigue." (Tr. 1157.)

There is an entry in Dr. Lora's chart with the results of diagnostic tests from the previous year. A pulmonary function test from September 2018 showed a "mild restriction and moderate diffusion defect;" a pulmonary function test from February 2019 showed "mod restriction and moderate diffusion defect." (Tr. 1167.) A CT scan of the plaintiff's chest on April 27, 2018 showed "stable extensive bilateral interstitial disease," while a CT scan taken approximately one year later on May 24, 2019 revealed "stable parenchymal disease with multifocal glass opacification," but otherwise no acute findings. (Tr. 1166-67.)

Dr. Burza examined the plaintiff again on July 5, 2019 and October 5, 2019, and wrote that the plaintiff had "no active symptoms, walks daily, usually not [shortness of breath]" each time. (Tr. 1143, 1153.) Dr. Burza did not find any "rales rhonchi or wheezes" during either lung

---

[10] Attending physician Dr. Ellen Ginzler, M.D. signed the plaintiff's chart on July 1, 2019. (Tr. 1157.)

7

exam. (Tr. 1144, 1154.) However, Dr. Burza found evidence of a bacterial lung infection, for which she prescribed antibiotics. (Tr. 1146, 1156.) Dr. Burza also noted the results of the patient's various CT scans and pulmonary function tests, but did not interpret them other than to say that the plaintiff's pulmonary nodule appeared unchanged. (Tr. 1156.)

The plaintiff visited the Downstate rheumatology clinic on August 12, 2019 and November 4, 2019. (Tr. 1133, 1147.) Dr. Ekaterina Simakova, a resident, examined her both times.[11] (Tr. 1141, 1152.) The plaintiff did not report any specific symptoms during her August 12, 2019 visit, but told the doctor that she had not started taking antibiotics for her lung infection. (Tr. 1147.) During her November 4, 2019 visit, the plaintiff reported mild joint stiffness, but otherwise had no complaints. (Tr. 1133.) The plaintiff's respiratory exams were normal; musculoskeletal exams revealed grinding in both of the plaintiff's knees but no joint inflammation in her hands. (Tr. 1136, 1149.) A September 2019 CT scan of the plaintiff's chest revealed a few discrete pulmonary nodules, "multifocal groundglass opacities," and "scattered areas of sparing."[12] (Tr. 1132.)

## LEGAL STANDARD

A court reviewing a Commissioner's final decision must "determin[e] whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)). Substantial evidence is "more than a mere scintilla," and "means such relevant evidence as a reasonable mind might accept as

---

[11] The attending physicians who signed the plaintiff's chart on August 12, 2018 and November 4, 2019 were Naureen Kabani, M.D. and Ellen Ginzler, respectively. (Tr. 1131, 1152.)

[12] "Sparing" refers to a type of opacity that appears in lung CT scans that is usually indicative of inflammation, infection or trauma. *See* Woon H. Chong, *et al.*, *The Significance of Subpleural Sparing in CT Chest: A State-of-the-Art-Review*, 361 AM. J. OF THE MED. SCI. 427, 427 (2021).

8

adequate to support a conclusion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  If substantial evidence exists to support the Commissioner's factual findings, those findings must be sustained.  42 U.S.C. § 405(g).  A district court judge cannot substitute her own judgment for that of the Commissioner "even if [she] might justifiably have reached a different result upon *de novo* review." *Cerqueira v. Colvin*, No. 14-CV-1134, 2015 WL 4656626, at *11 (E.D.N.Y. Aug. 5, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)).

While "factual findings by the Commissioner are 'binding' when 'supported by substantial evidence,'" the Court will not defer to the ALJ's determination if "an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004) (alteration in original) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, even if the Commissioner's decision is supported by substantial evidence, remand is warranted if "the ALJ has applied an improper legal standard" or if "there are gaps in the administrative record." *Price v. Berryhill*, 298 F. Supp. 3d 517, 525 (E.D.N.Y. 2018) (internal quotation marks omitted) (quoting *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999)).

## DISCUSSION

### I.  The ALJ's Duty to Develop the Administrative Record

"Although Plaintiff did not expressly challenge the sufficiency of the record, the Court must independently consider whether the ALJ satisfied [his] duty to develop the record." *Commisso v. Comm'r of Soc. Sec.*, No. 20-CV-4872, 2022 WL 742871, at *6 (E.D.N.Y., Mar. 11, 2022); *see also Segarra v. Comm'r of Soc. Sec.*, No. 20-CV-5801, 2022 WL 1051155, at *10 (S.D.N.Y. Feb. 17, 2022), *report and recommendation adopted*, 2022 WL 669877 (S.D.N.Y.

9

Mar. 7, 2022) ("Further, the court must satisfy itself that the administrative record has been adequately developed, regardless of whether the issue is raised by the plaintiff.").

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). Accordingly, an ALJ must "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted). "The ALJ's failure to develop the record is a threshold issue, because the Court cannot rule on whether the ALJ's decision regarding [the plaintiff's] functional capacity was supported by substantial evidence if the determination was based on an incomplete record." *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 267 (S.D.N.Y. 2016) (internal quotation marks omitted). "While there is no affirmative duty to resolve all inconsistencies in the record, the ALJ has a duty to develop the record if there exists obvious gaps." *Lebby v. Comm'r of Soc. Sec.*, No. 20-CV-4760, 2022 WL 580983, at *4 (E.D.N.Y. Feb. 24, 2022) (quoting *Rusin v. Berryhill*, 726 F. App'x 837, 840-41 (2d Cir. 2018)).

"[T]he ALJ must seek additional evidence or clarification when a report from a medical source contains a conflict or ambiguity, lacks necessary information, or is not based on medically acceptable clinical and laboratory diagnostic techniques." *Colucci v. Acting Comm'r of Soc. Sec.*, No. 19-CV-1412, 2021 WL 1209713, at *5 (E.D.N.Y. Mar. 31, 2021) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)). "In assembling a complete record, the SSA must 'make every reasonable effort' to 'get medical reports from [plaintiff's] medical sources.'" *Id.* (quoting 20 C.F.R. §§ 404.1512(d), 416.912(d)). "'Every reasonable effort' means making 'an initial request for evidence from [plaintiff's] medical source[s],' and, if no response has been received, 'one follow-up request.'" *Id.* (quoting 20 C.F.R. §§ 404.1512(d)(1), 416.912(d)(1)).

10

"Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings." *Nusraty v. Colvin*, 213 F. Supp. 3d 425, 442 (E.D.N.Y. 2016); *see also Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (finding remand "particularly appropriate" where the ALJ did not obtain adequate information from treating physicians and potentially relevant information from other doctors).

As discussed at greater length below, the ALJ did not consider the medical findings of the plaintiff's primary care physician, Dr. Orkin. These records are highly relevant to the plaintiff's disability, since Dr. Orkin treated the plaintiff repeatedly during the five months that the plaintiff had acute symptoms of interstitial lung disease. (Tr. 233-49.) To the extent the ALJ's review of Dr. Orkin's treatment records was "to any meaningful degree hampered by an inability to decipher the handwritten notes contained in those records, then the ALJ should have sought clarification from any doctors . . . whose handwriting was illegible, rather than give the notes no recognition or credence." *Sanchez v. Saul*, 18-CV-12102, 2020 WL 2951884, at *33 (S.D.N.Y. Jan. 13, 2020). The ALJ's failure to seek clarification of these handwritten notes requires remand. *Guarneri v. Berryhill*, No. 16-CV-5868, 2019 WL 1865195, at *16 (E.D.N.Y. Apr. 24, 2019) ("Failure to seek clarification of illegible notes from a doctor constitutes a failure to develop the record, especially when they are crucial to a plaintiff's claim."); *McClinton v. Colin*, No. 13-CV-8904, 2015 WL 5157029, at *23 ("When records produced are illegible but relevant to the plaintiff's claim, a remand is warranted to obtain supplementation and clarification.").

11

The ALJ also erred because he did not seek medical opinions or functional assessments from any of the plaintiff's other treating physicians.[13] *Manago v. Kijakazi*, No. 20-CV-1251, 2021 WL 4408966, at *8 (E.D.N.Y. Sept. 26, 2021) ("The ALJ failed to develop the record because the ALJ did not seek functional assessments from Plaintiff's treating physicians when the record consisted of only medical notes and records. The ALJ's decision demonstrates that the ALJ drew conclusions from Plaintiff's medical records as opposed to functional assessments from Plaintiff's treating physicians."); *Commisso*, 2022 WL 742871, at *6 ("Although the ALJ received Plaintiff's medical records, including progress notes from [the plaintiff's treating physicians], none of the records included a medical opinion about Plaintiff's abilities or physical limitations."); *Santiago v. Comm'r of Soc. Sec.*, No. 13-CV-3951, 2014 WL 3819304, at *17 (S.D.N.Y. Aug. 4, 2014) ("The ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced."). This duty still applies to claims filed after March 27, 2017 that are not subject to the "treating physician rule." *Commisso*, 2022 WL 742871, at * 6 (citing *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941, 2021 WL 3475625 at * 11 (S.D.N.Y. Aug. 6, 2021)).

The ALJ in *Commisso* similarly failed to request medical opinions from the plaintiff's treating physicians, and relied instead on their progress notes—that the plaintiff "claimed he exercised regularly" and was "asymptomatic from the cardiovascular perspective"—in concluding that the plaintiff had the RFC to continue working as a hair stylist. 2022 WL 742871, at *5-7. The court determined that these notes were "not medical opinions for the

---

[13] While ALJ's are not required to seek medical source statements from treating physicians in all circumstances, *see Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013), remand is appropriate here because "the medical records discuss her illness and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life." *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017).

12

purposes of the RFC determination" because the doctors did not opine on whether the plaintiff could "perform the physical demands of work activities" or "adapt to the work environment." *Id.* In this case, in assessing the plaintiff's RFC, the ALJ cited similar progress notes in which the treating physicians reported that the plaintiff had no complaints and could walk eight blocks, but which did not otherwise discuss the plaintiff's abilities or physical limitations. (Tr. 16, 17.)

While the plaintiff's medical record suggests that her lung condition and arthritis improved over time, there is also evidence that the plaintiff's interstitial lung disease continued well into 2018, not, as the ALJ wrote, for less than one year. (Tr. 16.) For example, a CT scan of the plaintiff's chest on April 27, 2018, showed "stable extensive bilateral interstitial disease." (Tr. 1166.) Similarly, a pulmonary function test from February 2019 showed "mod restriction and moderate diffusion defect." (Tr. 1167.) None of the plaintiff's medical providers expressed an opinion about what these tests meant; it is not clear the extent to which they would have affected the ALJ's RFC determination.

Medical source statements are also necessary to interpret objective measures of the plaintiff's arthritis. The ALJ notes that the plaintiff's "rheumatoid factor" on March 30, 2017 was 23.7 IU/ml, which the ALJ characterized as abnormally high.[14] (Tr. 15.) By June 16, 2017, that reading had increased to 125 IU/ml (Tr. 515), and on August 4, 2017, the reading was 114.6 IU/ml. (Tr. 712.) These elevated levels correspond to the times when the plaintiff experienced her most severe and debilitating symptoms during the spring and summer of 2017. (*See* Tr. 18.) However, the plaintiff's rheumatoid factor remained elevated long after the summer of 2017, which the ALJ did not consider.[15]

---

[14] According to the record, a rheumatoid factor above 14-20 IU/ml is abnormally high. (Tr. 51, 288, 741.)

[15] The plaintiff's rheumatoid factor on April 11, 2018 was 189, which according to the record was "above high normal." (Tr. 1122.)

13

Moreover, the record does not include any evidence from May 2018 to July 2019. The ALJ commented that the plaintiff "does not appear to have seen any medical providers more than 12 months after the alleged onset date of disability." (Tr. 17.) The Commissioner alleges that this gap is evidence that the plaintiff overstated the severity of her impairments. (ECF No. 12-1 at 20.) However, the plaintiff regularly sought medical treatment from 2017 to 2018 and again in the summer of 2019, which makes it likely that she also had medical appointments in those intervening 14 months. Indeed, medical records from 2019 refer to two pulmonary function tests from September 2018 and February 2019, suggesting the plaintiff received medical treatment during this time. (Tr. 1167.) Remand is necessary so that the ALJ can clarify the record on this point.[16]

Finally, there is a significant contradiction in the record that requires further analysis. In his decision, the ALJ makes three references to an October 27, 2017 progress note that the plaintiff reported feeling "remarkable better." (Tr. 16, 17, 20.) The same day, the plaintiff reported that she was experiencing severe pain that she rated as an eight out of a possible ten. (Tr. 796-97.) Moreover, this particular note is identical to a September 29, 2019 note, and even includes the same typographical error, which suggests the note may have been copied by accident. On remand, the ALJ should resolve this discrepancy if it is possible to do so. *Lowry v.*

---

[16] At the request of the plaintiff's attorney, the ALJ subpoenaed missing records from SUNY Downstate Medical Center. (Tr. 11.) However, these records start in July of 2019. (Tr. 1168.) "[W]hile an ALJ may rely on the claimant's counsel in the first instance to obtain missing treating records, she must nevertheless take 'independent steps to complete the record' if necessary. Thus, courts in our Circuit have frequently found that an ALJ does not satisfy her duty to develop the record by relying on the claimant's attorney to obtain the missing records." *Dillon v. Comm'r of Soc. Sec.*, No. 17-CV-4136, 2018 U.S. Dist. LEXIS 154897, at *49-50 (S.D.N.Y. Sept. 7, 2018) (internal citations omitted); *Newsome v. Astrue*, 817 F. Supp. 2d 111, 137 (E.D.N.Y. 2011) ("The fact that the ALJ requested additional information from the Plaintiff's attorney and did not receive that information does not relieve the ALJ of his duty to fully develop the record.").

14

*Astrue*, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) ("While obvious gaps in the record may include missing medical evidence, inconsistencies or vague opinions can also create a duty to further develop the record.").

## II.     The ALJ's Assessment of the Medical Opinions

The treating physician rule does not apply to this case because the plaintiff filed her claim after March 27, 2017; instead, 20 C.F.R. § 404.1520c applies.  Pursuant to that rule, the ALJ considers five factors in deciding whether a medical opinion is persuasive: (1) supportability; (2) consistency; (3) the source's relationship with the patient; (4) the source's specialty; and (5) "other factors that tend to support or contradict" the opinion.  20 C.F.R. §§ 404.1520c(c)(1)-(c)(5).  After considering these factors, the ALJ must articulate "how persuasive she find[s] all of the medical opinions and all of the prior administrative medical findings in [the plaintiff's] case record."  *Id*. § 404.1520c(b).

The most important factors are supportability and consistency.  *Id*. § 404.1520c(b)(2).  While the ALJ is not required to explain his consideration of all five factors, he must discuss these two.  *Id*.  On the issue of supportability, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id*. § 404.1520c(c)(1).  As for consistency, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id*. § 404.1520c(c)(2).

As noted above, the ALJ did not evaluate the medical reports from the plaintiff's primary care physician, Dr. Orkin.  Dr. Orkin provided records from 16 medical appointments between

15

2015 and 2017, more than any other treating source in the record, but the ALJ does not appear to have considered these records. (Tr. 233-49.) The regulations do not require the ALJ to articulate how he evaluated record, but he must explain how he "considered the medical opinions or prior administrative medical findings from [Dr. Orkin] together in a single analysis." 20 C.F.R. § 404.1520c(b)(1). Remand is appropriate so that the ALJ may evaluate Dr. Orkin's record pursuant to 20 C.F.R. § 404.1520c(b)(1).

The absence of any discussion of these records also affects the ALJ's RFC determination. "Even though ALJs are no longer directed to afford controlling weight to treating source opinions," the regulations "still recognize the foundational nature of the observations of treating sources." *Soto v. Comm'r of Soc. Sec.*, No. 19-CV-4631, 2020 WL 5820566, at *4 (E.D.N.Y. Sept. 30, 2020) (quoting *Shawn H. v. Comm'r of Soc. Sec.*, No. 19-CV-113, 2020 WL 3969879, at *6 (D. Vt. July 14, 2020)). Because a treating source examines a claimant directly, they "may have a better understanding of [a claimant's] impairment(s) . . . than if the medical source only reviews evidence in [a claimant's] folder." *Soto*, 2020 WL 5820566, at *4 (quoting 20 C.F.R. § 404.1520c(c)(3)(v)); *see also Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) (noting in the context of the treating physician rule that "a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once" (citation omitted)). Dr. Orkin treated the plaintiff regularly, including during the five months before she was hospitalized with interstitial lung disease. (Tr. 333.) Unlike Dr. Orkin, who saw the plaintiff repeatedly over multiple years, many of the other treating sources were medical residents who saw the plaintiff only once. (*See* Tr. 293, 295, 727, 772, 801, 1168.)

Remand is also necessary so that the ALJ can get medical source statements from the plaintiff's treating physicians and consider them. *Commisso*, 2022 WL 742871, at *8 ("Further,

16

the consistency of the state medical consultants' opinions with the medical record is not "persuasive" where, as here, the record is undeveloped and contains no opinions about the plaintiff's abilities and physical limitations from his treating physicians.")

The ALJ based his RFC determinations on two medical source statements from state-appointed consultants. Dr. Ravi examined the plaintiff only once, and Dr. Feldman reviewed only the plaintiff's medical file. (Tr. 62, 822.) RFC determinations that depend entirely on the opinions of non-examining experts and one-time consultative examiners are not supported by substantial evidence. *See Avila v. Comm'r of Soc. Sec. Admin.*, No. 20-CV-1360, 2021 WL 3774317, at *20 (S.D.N.Y. Aug. 9, 2021) ("Even where a non-examining opinion is properly afforded some weight, it, alone, cannot be considered substantial evidence."); *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019) ("We have frequently "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination."). Neither Dr. Ravi nor Dr. Feldman had access to the plaintiff's medical records from after the fall of 2017. *Benitez v. Comm'r of Soc. Sec.*, No. 20-CV-5026, 2021 WL 4239244, at *15 (E.D.N.Y. Sept. 17, 2021) ("[W]here a consultative examiner did not review important medical records, the consultative examiner's opinion cannot constitute . . . substantial evidence to support an RFC."); *Camille v. Colvin*, 104 F. Supp. 3d 329, 343-44 (W.D.N.Y. 2015), *aff'd*, 652 F. App'x 25 (2d Cir. 2016) ("[M]edical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." (internal quotation marks and citation omitted)).

Because there are no medical source statements about the plaintiff's RFC after the fall of 2017, the ALJ was left to "'form his own medical opinion based on the raw medical evidence.'" *Arias v. Saul*, No. 18-CV-1296, 2020 WL 1989277, at *9 (E.D.N.Y. Apr. 25, 2020) (quoting

17

*Goble v. Colvin*, No. 15-CV-6302, 2016 WL 3179901, at *6 (W.D.N.Y. June 8, 2016)). In concluding that the plaintiff's interstitial lung disease was not severe, the ALJ cited a pulmonary function from October 18, 2017 that "revealed an FEV1 value of 101% predicted post-bronchodilator" as evidence.[17] (Tr. 13.) The record, however, does not include a doctor's opinion about the significance of this finding or whether it would have affected the plaintiff's RFC. At another point, the ALJ interpreted laboratory bloodwork but did not cite a medical expert explanation. (Tr. 15 ("laboratory testing revealed elevated ESR levels and an abnormally high rheumatoid factor").) An "ALJ who makes an RFC determination in the absence of a supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Jackson v. Berryhill*, No. 18-CV-4569, 2019 WL 4593648, at *8 (S.D.N.Y. Sept. 23, 2019) (quoting *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, at *13 (E.D.N.Y. Sept. 11, 2012)).[18]

---

[17] Dr. Feldman, the non-examining expert who reviewed the plaintiff's file on November 7, 2017, wrote that the plaintiff's chronic respiratory disorders were a severe impairment. (Tr. 58.)

[18] On remand, the ALJ should re-evaluate the record on two points. The ALJ wrote that the plaintiff stopped smoking in 2017 (Tr. 16), but the plaintiff said that she smoked only for two years between 1979 and 1981. (Tr. 1143.) In another instance, the ALJ states that the plaintiff lost 30 pounds because of her interstitial lung disease (Tr. 16), but the record reflects that she lost nearly double that amount of weight. (Tr. 726.)

## CONCLUSION

The plaintiff's motion for judgment on the pleadings is granted, and the Commissioner's motion is denied. The case is remanded for further proceedings consistent with this opinion.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       September 29, 2022